UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID C. PATKINS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TRAN, et al.,<br><br>　　　　Defendants. | Case No. 15-cv-05073-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 23 |

## I. INTRODUCTION

In this *pro se* prisoner's civil rights action, David Patkins contends that four prison dentists were deliberately indifferent in their responses to his complaints about his dental bridge. Defendants have filed a motion for summary judgment, which Mr. Patkins has opposed. For the reasons discussed below, Defendants' motion for summary judgment will be granted and judgment entered against Mr. Patkins.

## II. BACKGROUND

A dental bridge may be used to deal with missing teeth. The teeth at the end of a bridge are called the abutment teeth. The bridge may be cemented to those abutment teeth and covers the gap where the teeth between those abutment teeth are missing.

This case concerns four dentists' responses to Mr. Patkins' requests for services on his dental bridge. The following facts are undisputed unless otherwise noted.

A. <u>Dental Care For The Bridge</u>

The events and omissions giving rise to Mr. Patkins' complaint occurred in 2014 through late 2015. At the relevant time, Mr. Patkins was an inmate at the Correctional Training Facility (CTF) in Soledad, California. Also at the relevant time, Dr. Tran, Dr. Babienco, Dr. Chang, and

Dr. Kamminga were dentists providing dental care to inmates at CTF.

Mr. Patkins received a dental bridge in 1998, covering a four-tooth area from his top right central incisor (i.e., tooth # 8) to his top left canine tooth (i.e., tooth # 11). (Docket No. 26 at 2.) The incisor and the canine were the abutment teeth on his bridge, and his bridge covered the gap where two teeth were missing between the abutment teeth.

In 2007, the margin where the bridge met tooth # 8 was patched with a composite filling. (Docket No. 26 at 12; Dental 0015, 0018.)

After 15+ years and one patch job, the bridge developed problems, loosening at first and later fully detaching.

On March 4, 2014, Mr. Patkins submitted a request for care because "one post" on his bridge was loose. (Dental 0046.)[1]

On March 17, 2014, a nondefendant dentist saw Mr. Patkins, and noted that Mr. Patkins' bridge had no mobility but that the spaces between his gum and his abutment teeth were probed to pocket depths of 333/434. The gum depths pertain to the periodontal health of a tooth and those numbers reflect "moderate bone loss," according to dentist Dr. Uy. (Docket No. 23-1 at 3; Dental 0056-57.)

On April 3, 2014, Dr. Babienco attempted to detach the bridge to recement it, but one side of it remained fastened so the bridge could not be detached for recementing. (Docket No. 26 at 2.)

On May 22, 2014, Mr. Patkins submitted a request for periodontal treatment. One or two nondefendant dentists did the periodontal care (i.e., scaling and root planing) in two sessions, on May 22 and in mid-June 2014. (Docket No. 23-1 at 3; Dental 0056, 0058, 0061, 0067; Docket No. 26 at 2, 13.) According to Mr. Patkins, at the second session, the nondefendant dentist told him his abutment teeth were "'strong and healthy.'" (Docket No. 26 at 2, 13.)

On June 10, 2014, Mr. Patkins requested care because his bridge had fully detached. (Dental 0062.) When the bridge detached, the exposed abutment teeth became highly sensitive to

---

[1] For ease of reference, the Court uses the page-numbering format stamped on Mr. Patkins' dental records, i.e., the word "dental" followed by a four-digit page number. The dental records are attached as Exhibit A to the Uy Declaration at Docket No. 23-1.

hot and cold temperatures in food, liquid and weather; and caused pain and headaches. (Docket No. 26 at 2-3.)

On June 18, 2014, Dr. Tran noted on Mr. Patkins' treatment plan that the bridge needed to be recemented, but he did not see Mr. Patkins that day. (Docket No. 26 at 13.) On July 2, 2014, Dr. Tran recemented the bridge. (Dental 0066, 0068.) According to Mr. Patkins, before she recemented the bridge, Dr. Tran stated that the bridge did not fit right. (Docket No. 26 at 4.) Also according to Mr. Patkins, Dr. Tran said that dentists at CTF do not cement bridges and she proposed extracting the abutment teeth. (*Id.*; Docket No. 20 at 8.) Mr. Patkins' teeth were not extracted.

On July 31, 2014, Mr. Patkins submitted a request for care because his bridge had loosened on about July 15, and his abutment teeth were highly sensitive. He noted that "maybe an outside expert is appropriate." (Dental 0069.)

Dr. Tran saw Mr. Patkins on August 6, 2014. Dr. Tran wrote that the bridge was not loose but that there was exposed enamel at the crown margin of tooth # 11. She again suggested tooth extraction. (Docket No. 23-1 at 3; Dental 0073.)

On August 19 or 20, 2014, Dr. Babienco interviewed Mr. Patkins in connection with an inmate appeal. Dr. Babienco made a note to recement the bridge. (Dental 0074.)

On September 5, 2014, Dr. Chang recemented the bridge using Duralon cement. Dr. Chang told Mr. Patkins that the bridge may loosen again. (Dental 0076 ("inf. pt. that prep of #8-11 FPD is too tapered & may loosen again."))

On October 4, 2014, Mr. Patkins submitted a request for care because his bridge had detached. He requested an "outside expert [to] properly cement [his] bridge." (Dental 0077.)

Dr. Babienco saw him on October 9, 2014, and advised Mr. Patkins that he would be given a ducat for an appointment to have a dentist recement the bridge. Dr. Babienco's note appears to state "ducat for recementation of bridge, if clinician [?] determines bridge cannot be recement[ed] then the issue is completed." (Dental 0082.) Mr. Patkins states that Dr. Babienco told Mr. Patkins he could "wait till [his] life sentence is over before [he would] get a proper cementing" of the bridge." (Docket No. 20 at 14.) Mr. Patkins alleges that Dr. Babienco "permanently banned

3

plaintiff from dental services" (*id.*), but this apparently was hyperbole by either the dentist or patient because Mr. Patkins continued to receive care from Dr. Babienco and other dental staff.[2]

On October 20, 2014, Dr. Chang recemented the bridge. Mr. Patkins signed a refusal to have teeth # 8 and # 11 extracted. Dr. Chang told him that the refusal may lead to pain and/or swelling, and to submit a form 7362 to request dental care. (Dental 0085.)

On November 7, 2014, Dr. Uy (a nondefendant who was a supervising dentist at CTF) examined Mr. Patkins. Dr. Uy discussed with Mr. Patkins the possibility that teeth-grinding during sleep was causing additional problems with the bridge, and prescribed a night guard for Mr. Patkins' teeth. Dr. Uy also noted a slight gap between the bridge and the gum line. (Docket No. 23-1 at 4; Dental 0093.) Mr. Patkins told Dr. Uy that the gap was "filler sealed for those 15 years--until dentist Tran worked it off at the 7-2-14 recementing." (Docket No. 20 at 15.) Mr. Patkins denies that he grinds his teeth.

Mr. Patkins was fitted for a dental guard on November 17, 2014, and, when the night guard mold was removed, the bridge came out with it. Dr. Chang recemented the bridge that day. (Docket No. 20 at 16.) Mr. Patkins refused the night guard the next week. (Dental 0095.)

On February 2, 2015, Mr. Patkins requested care for the bridge that had again detached. (Dental 0096.)

Dr. Babienco recemented the bridge using Duralon cement on February 11, 2015. (Dental 0099.)

On May 29, 2015, Mr. Patkins requested care for the bridge that had again detached. (Dental 0101.)

On June 4, 2015, Dr. Kamminga noted that the bridge was loose and ill-fitting. She advised Mr. Patkins to have a comprehensive annual examination and to keep the loose bridge out

---

[2] That is, after allegedly being permanently banned from dental services, Mr. Patkins had his bridge recemented on several occasions, dental exams, teeth cleaning, fillings and x-rays. (*See, e.g.,* Dental 0083 (fillings on two teeth on October 20, 2014), Dental 0086 (periodontal evaluation on October 27, 2014), Dental 0100 (periodontal treatment on February 17, 2015), Dental 0109 (dental exam with x-rays on April 15, 2016), Dental 0111 (follow-up check of tooth # 29), Dental 0118 (dental cleaning on July 18, 2016), Dental 0119 (dental cleaning on July 21, 2016).

4

of his mouth to avoid aspirating it. Dr. Kamminga did not recement the bridge.[3] She informed Mr. Patkins that, according to policy, he was not eligible for replacement fixed dental prostheses. (Dental 0104.) According to Mr. Patkins, an unnamed nurse "asserted the cement used is not for bridges." (Docket No. 20 at 18.)

After this action was filed, Dr. Chang recemented the bridge again on July 28, 2016. (Dental 0120.) The bridge was still "secured and holding tight" as of mid-December 2016. (Docket No. 26 at 6.

B. Expert Opinion Evidence

Dr. Uy, a supervising dentist at CTF, offers his views about Mr. Patkins' care:

> In my professional opinion, based upon my review of his dental records, Patkins received from Drs. Babienco, Tran, Chang and Kamminga all reasonable and necessary care for his dental bridge complaints consistent with community standards and his current dental health condition. Their individual recommendations were all medically acceptable ones. Moreover, an appropriate course of action was planned and ordered, as reflected by the dental records, to address his complaints relative to his dental bridge. It is evident that the permanent prosthetic dental bridge which according to Patkins had been fitted into his mouth in 1998 was no longer fitting, and attempts to recement it back into place mostly resulted in failure. (Patkins is fortunate in that the loosening of the bridge from anchoring teeth did not result in any subsequent decay.) The correctional health care regulations do not allow for the production of a new prosthetic bridge.

(Docket No. 23-1 at 5.)

C. CDCR Policies

Chapter 5.15 (Dental Care) of the CDCR's Policy & Procedures Manual (hereinafter "CDCR Manual") provides, in relevant parts: "The CDCR shall provide clinically necessary dental care for all inmate-patients in a timely manner, under the direction and supervision of dentists licensed by the Dental Board of California." (Docket No. 23-1 at 129 (CDCR Manual at § I)). "Clinically necessary" services are defined as "[h]ealth care services that are determined by the attending dentist, or other licensed health care provider, to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, and that are supported

---

[3] Mr. Patkins indicates he used denture adhesive to hold the loose bridge in place to avoid a choking hazard. (Docket No. 20 at 7.)

5

by health outcome data as being effective." *Id.* (CDCR Manual at § III). The CDCR Manual also provides that some dental services are not provided for prisoners:

> Excluded Services
>
> 1. Excluded dental services refer to attempted curative treatments and do not preclude palliative therapies to alleviate serious debilitating conditions such as pain management and nutritional support.
>
> 2. Dental services or treatment shall not be routinely provided for the following conditions:
>
> . . .
>
>     f. Root canals on posterior teeth (bicuspids and molars).
>     g. Implants.
>     *h. Fixed prosthodontics (dental bridges).*
>     i. Laboratory processed crowns.
>     j. Orthodontics.
>
> Exceptions to Excluded Dental Services
>
> Treatment for conditions that are excluded within these regulations *may* be provided in cases where all of the following criteria are met.
>
> 1. The inmate-patient's attending dentist prescribes the treatment.
>
> 2. The treatment is clinically necessary.
>
> 3. The service is approved by the facility's [specified committees].

Docket No. 23-1 at 131-32 (CDCR Manual at § IV, ¶¶ H-I) (first emphasis added); *see also* Cal. Code Regs. tit. 15, § 3350(c)(6).

CTF had a policy that an inmate will not "be deprived of a prescribed dental prosthesis which was in his possession upon arrival" in the CDCR system "unless a provider determines the appliance is no longer needed or its removal is indicated for reasons of safety and security." (Docket No. 26 at 49.)

D.    <u>Inmate Appeal</u>

Mr. Patkins filed an inmate health care appeal on August 9, 2014, complaining about the care of his bridge. (Docket 26 at 36.)

The inmate appeal was decided at the first level on August 21, 2014, by defendant Dr. Babienco. (Docket No. 26 at 42-43.) Dr. Babienco denied Patkins' requests to see a new dentist

6

and to be treated by an outside expert. The appeal response further stated:

> Your third issue is a request to preserve the "healthy and strong posts" supporting your bridge. You are advised there are no posts on either abutment teeth supporting your bridge. These teeth have suffered heavy abrasion over the years resulting in their weakening and are the primary reason your bridge has failed and come loose. You are further advised that another attempt may be considered to recement your bridge. However, the dentist's decision, based on his/her clinical expertise and experience, as to whether or not such recementation is clinically acceptable, is final. Bridges can fail for a number of reasons and no guarantee is given that another recementation will be successful long term. Your request to have the "healthy and strong posts" preserved is partially granted.

Docket No. 26 at 43.[4]

Mr. Patkins pursued his appeal to the second level, where the response was to again deny the request to see another dentist and to be treated by an outside expert. As to the third issue, the response stated: "X-rays and progress notes were reviewed and you are informed that there are no posts on either abutment teeth supporting your bridge. Your request to preserve the 'healthy & strong' posts versus the posts being exposed daily is Denied." (Docket No. 26 at 44-45.)

Mr. Patkins pursued his appeal to the third level. The inmate appeal was rejected at the third level in a response that concluded: "After review, no intervention at the Director's Level of Review is necessary as your dental condition has been evaluated and you are receiving treatment deemed medically necessary." (Docket No. 26 at 47.)

### III. VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the complaint occurred at a prison in Monterey County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). The Court has federal question jurisdiction over

---

[4] Mr. Patkins alleged in his complaint that Dr. Babienco's decision to "partially grant" the request was a "material contradiction" to Dr. Babienco's statement that there were "weakened and heavily abrased abutments." (Docket No. 1 at 10.) As was explained in an earlier order, Mr. Patkins misread the first-level appeal response when he alleged that the response showed that Dr. Babienco had contradicted himself. The order of service explained that, in the context of the response to the inmate appeal, Dr. Babienco's "statement that the 'request to have the "healthy and strong posts" preserved is partially granted' appears to be a reference to the potential recementing of the bridge, rather than a declaration that there were healthy and strong posts in Mr. Patkins' teeth." (Docket No. 3 at 2 n.2 (Order of Service, signed by Magistrate Judge Beeler)).

7

1  this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

## IV.　**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against plaintiff on the merits of his claim. In such a situation, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Mr. Patkins' amended complaint (Docket No. 20) is made under penalty of perjury, so the facts therein are considered in the adjudication of the summary judgment motion.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W.*

8

*Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id*. at 631.

## V. DISCUSSION

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

To satisfy the objective prong, there must be a deprivation of a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury" or the "'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Serious medical needs include serious dental needs. *See Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989).

The evidence in the record showing that Mr. Patkins had a dental bridge that repeatedly detached, and that he experienced high sensitivity in the exposed abutment teeth when the bridge was detached, would allow a reasonable jury to conclude that Mr. Patkins had a serious dental need. A reasonable jury could find the objective prong of an Eighth Amendment claim satisfied.

For the subjective prong, there must be deliberate indifference. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin*

*v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*). There must be "harm caused by the indifference," although the harm does not need to be substantial. *See Jett*, 439 F.3d at 1096.

Negligence does not amount to deliberate indifference and does not satisfy the subjective prong of an Eighth Amendment claim. S*ee Wilhelm v. Rotman*, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (finding no deliberate indifference but merely a "negligent misdiagnosis" by defendant-doctor who decided not to operate because he thought plaintiff was not suffering from a hernia).

A difference of opinion as to which medically acceptable course of treatment should be followed also does not establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058; *Sanchez v. Vild*, 891 F.2d 240 (9th Cir. 1989) (summary judgment for defendants was properly granted because plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to proper course of care where prison medical staff treated his recurring abscesses with medicines and hot packs). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi,* 391 F.3d at 1058 (second alteration in original); *see Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837).

Having carefully reviewed the evidence, the court concludes that no reasonable jury could find that Defendants' responses to Mr. Patkins' dental needs amounted to deliberate indifference. The undisputed evidence shows that Mr. Patkins' dental bridge began to have problems in 2014, after more than 15 years in his mouth and about seven years after the tooth had a filling done at the margin where the bridge met the tooth. Although there is ample evidence that Mr. Patkins repeatedly requested care for problems with his dental bridge, the undisputed evidence also shows that prison dentists repeatedly examined him and repeatedly attempted to recement the bridge.

1  Defendants recemented the bridge at least five times (i.e., on July 2, September 5, October 20, and

2  November 17, 2014; on February 11, 2015) and it detached after each of those efforts.[5]  No

3  reasonable jury could conclude that attempting to recement the bridge, in accordance with the

4  patient's request, was medically unacceptable or done in conscious disregard of an excessive risk

5  to the patient's health.

The evidence in the record shows that the only dentist who refused to attempt to recement the detached bridge was Dr. Kamminga, who examined Mr. Patkins on June 4, 2015. Dr. Kamminga noted that the bridge was ill-fitting and told Mr. Patkins to keep the loose bridge out of his mouth to avoid aspirating it. Mr. Patkins does not show that Dr. Kamminga's response to Mr. Patkins' request for care was medically unacceptable, as this visit occurred after there had been five unsuccessful efforts to recement the bridge, after several dentists had informed him the bridge was ill-fitting, after Mr. Patkins had twice refused to have the abutment teeth extracted (as recommended by Dr. Tran on July 2, 2014 and by Dr. Chang on October 20, 2014), and after Mr. Patkins refused to wear the night guard (as recommended by Dr. Uy on November 7, 2014). At the June 4, 2015, visit, Dr. Kamminga told Mr. Patkins that he was not eligible for a replacement fixed dental prosthesis under the CDCR's policy.

Neither Dr. Kamminga nor any other Defendant is liable for failing to provide a replacement bridge for Mr. Patkins, given the undisputed evidence that the dental services provided for inmates do not include dental bridges as a matter of CDCR policy. *See* CDCR Manual at § IV.H.2 ("Dental services or treatment shall not be routinely provided for . . . Fixed prosthodontics (dental bridges)"). "A prison medical official who fails to provide needed treatment because he lacks the necessary resources can hardly be said to have intended to punish the inmate." *Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2014) (en banc).[6] The CDCR

---

[5] The bridge was recemented for a sixth time on July 28, 2016, after this action was filed, and that recementation was still holding as of the date on which Mr. Patkins filed his opposition to the motion for summary judgment.

[6] In *Peralta*, the prisoner complained of delays of several months in getting his teeth cleaned and a failure to treat his dental pain related to cavities and bleeding gums; the prison dentist responded at trial with evidence that the prison's dental department was understaffed and there were not enough dentists to provide dental care on demand to prisoners. *Peralta*, 744 F.3d at 1081-82. The trial

11

policy excluding bridges from the dental services provided for inmates must be taken into consideration in evaluating whether individual Defendants, such as Dr. Kamminga, acted with deliberate indifference, as Mr. Patkins' claims are based on the dental care by individual dentists working under that policy. Because the allowable dental services for prisoners did not include bridges, the law does not impose liability for damages on Dr. Kamminga or other dentists for not providing a replacement bridge for Mr. Patkins. *See, e.g., Allen v. Cheung*, 2014 WL 6685733, *5-6 & n.5 (E.D. Cal. 2014) (applying *Peralta* to grant summary judgment for jail dentist where jail's policy was that root canals were not performed at all; jail dentist offered to extract tooth rather than perform root canal and did extract the tooth when equipment first became available). The evidence shows that, although a replacement bridge would not be manufactured for Mr. Patkins, dental staff had offered to extract his abutment teeth but Mr. Patkins chose not to accept that offer.

Mr. Patkins points out that there is a CTF policy that "[n]o inmate-patient shall be deprived of a prescribed dental prosthesis which was in his possession upon arrival" in prison. (Docket No. 26 at 3, 49.) The existence of this policy does not enable Mr. Patkins to avoid summary judgment for two reasons. First, it is not clear whether the "dental prosthesis" discussed in that policy means a dental bridge, as several portions of that policy indicate that a "dental prosthesis" refers to dentures. For example, one passage in the policy directs the dentist to "[s]elect the type of dental prostheses, (e.g., upper and/or lower full dentures, upper and/or lower partials, or upper and/or lower immediate dentures)," and another passage requires that the dental prosthesis have the inmate's name and CDCR number inscribed on it. (Docket No. 26 at 50.) Second, and more importantly, even if the policy against depriving an inmates of dental prostheses covers a dental

---

court instructed the jury that, whether a defendant has met his duties to a prisoner under the Eighth Amendment "'must be considered in the context of the personnel, financial, and other resources available to him or her or which he or she could reasonably obtain,'" and that a dentist "'is not responsible for services which he or she could not render or cause to be rendered because the necessary personnel, financial, and other resources were not available . . . or which he or she could not reasonably obtain.'" *Id.* at 1082 (ellipses in source). The Ninth Circuit upheld the giving of these instructions, explaining that an individual dentist is not liable for damages for failing to provide care that the dentist could not have provided; the resources available to the individual dentist are "highly relevant because they define the spectrum of choices that officials had at their disposal." *Id.* at 1083.

12

bridge, there is no evidence that any Defendant actually deprived him of, or took away, the dental bridge. A policy that prohibits officials from depriving an inmate of an item he possesses -- whether it be a television, dental prosthesis, or notebook -- cannot reasonably be interpreted as being tantamount to a lifetime guarantee to repair and replace the existing item. Mr. Patkins' suggested interpretation is unreasonable, unsupported by the text, and inconsistent with CDCR's policy to not provide dental bridges.

Mr. Patkins offers several theories as to why the recementing efforts failed repeatedly, but does not provide competent evidence to show a triable issue in support of his theories. He urges that the Defendants did not properly prepare the bridge and/or the abutment teeth, the dentists did not use the right sort of cement, the dentists did not properly prepare the cement they did use, or that some combination of the foregoing occurred. (Docket No. 26 at 3.)[7] But he provides no competent proof to support any of his theories. Mr. Patkins has submitted no evidence to show that he has any dental training and thus is not qualified to opine on the dental issues involved in this case beyond his own perceptions. *See* Fed. R. Evid. 701, 702. He also has not submitted any declaration of any expert to attack the adequacy of the dental care provided by Defendants. Mr. Patkins' personal beliefs and lay opinions as to how his detaching bridge should have been handled could not alone support a finding that Defendants were deliberately indifferent in their handling of the detaching bridge. *See, e.g.*, *Hawkins v. Mahoney*, 2006 WL 2587753, *7 (D. Mont. 2006) (prisoner's assertion that his dental problems were caused by prison dentist's

---

[7] For example, Mr. Patkins states that on five occasions, the defendant-dentists "used a water based cement that became chalky, and brittle, with no adhesion quality, namely, 'Tylok Plus' and/or 'Durelon.'" (Docket No. 26 at 6.) The product brochures he attaches for those products plainly list them as dental cements and as cements for use on bridges. (Docket No. 26 at 58 (Durelon/Durelon Fast Set is a "carboxylane cement in the traditional powder and liquid form fir cementing inlays, crowns, bridges and more"), 60 (Tylok Plus "is an anhydrous polycarboxylate cement powder designed to be mixed with distilled water. . . . [and] adheres to enamel, dentin and stainless steel and is intended for definitive cementation of inlays, onlays, full crown and bridges, and fixed orthodontic bands and appliances.")) Mr. Patkins speculates also that the cements might have been expired, but provides no factual basis for that speculation.

Mr. Patkins states that, when his bridge was recemented on July 28, 2016 -- i.e., the recementation that was still holding as of the date he filed his opposition to the motion for summary judgment -- GC Fuji Plus cementing product was used by Dr. Chang. Mr. Patkins fails to present evidence that the success of this product on his bridge shows the other products to be medically unacceptable.

13

"decision to use 'dental super-glue' to prevent the loosening" of a bridge from the tooth was insufficient to defeat summary judgment because prisoner "is not a dentist, and he has no expert knowledge as to what is acceptable or unacceptable dental practice"). Even if he was a dentist or showed some expertise in dentistry, Mr. Patkins' beliefs and opinions would amount only to a difference of opinion and would not demonstrate deliberate indifference by Defendants.

Mr. Patkins also contends that dentists wanted to extract his teeth to earn a "bonus" for extracting teeth. (Docket No. 20 at 7; Docket No. 26 at 3.) But he presents no evidence that such a bonus system existed, let alone that any Defendant chose his or her course of care based on such a system.

The evidence shows that Defendants noted on several occasions that the fit between the bridge and the abutment teeth was imperfect. The fact that several dentists expressed the problem differently -- e.g., the abutment teeth were too tapered (according to Dr. Chang), the abutment teeth had suffered heavy abrasion and wear over the years (according to Dr. Babienco), or there was exposed enamel at the crown margin (according to Dr. Tran) -- does not raise a genuine issue of fact because the precise way in which the teeth and bridge did not fit together does not matter for purposes of Mr. Patkins' claim. Mr. Patkins disagrees with the views of several dentists that the bridge no longer fit properly on the teeth. Mr. Patkins states that (a) the bridge was, in his view, "without damage" and (b) at a teeth cleaning in June 2014, a dentist told him his abutment teeth were "strong and healthy." (Docket No. 26 at 3.) His evidence does not show a genuine issue of fact because, although Mr. Patkins certainly can say as a lay person that a dental bridge appears to be without damage or perhaps that the bite feels acceptable, he does not show any expertise to opine as to the precise fit of the bridge on the abutment teeth. The dentist's comment that the abutment teeth were "strong and healthy" does not speak to whether the bridge fit properly on the teeth, and in fact was made after the bridge already had detached. Not only is Mr. Patkins' own say-so not competent evidence as to the fit of the bridge on the teeth, his own evidence plainly undermines his position that the bridge was fine: the bridge had loosened before any of the Defendants worked on it. Moreover, even Mr. Patkins acknowledges that there was some sort of gap at the margin between one tooth and the bridge, as he states that the gap was "filler sealed" for

14

several years before Dr. Tran "worked it off." (Docket No. 20 at 15; *see also* Docket No. 26 at 12 (arguing for recementation plus "a composite filling within any margin post recementation."))

Mr. Patkins appears to argue that the dentist's proposal to extract his two abutment teeth was medically unacceptable because the teeth were characterized by a dentist in 2014 as being healthy and strong, and because they apparently do not suffer from decay. Mr. Patkins' own evidence plainly shows that the absence of decay and the "strong and healthy" state of the abutment teeth in 2014 does not tell the whole story of those abutment teeth. The abutment teeth had been "ground down" and enamel was removed to accommodate the fitting of the bridge in 1998. (Docket No. 26 at 6.) When the abutment teeth are not covered by the bridge, the abutment teeth are "high[ly] sensitiv[e]" to hot and cold temperatures, and are "vulnerable to degeneration and decay." (Docket No. 26 at 2-3, 6.) Also, when the abutment teeth are exposed, Mr. Patkins experiences tingling, shooting pains, throbbing pains, and headaches; and he bites his tongue and lips with the tapered abutments. *Id.* The list of problems caused by the exposed abutment teeth undermines Mr. Patkins' assertion that the dentist's recommendation that the abutment teeth be extracted was medically unacceptable. Put another way, Mr. Patkins does not present evidence that would allow a reasonable jury to conclude that, in a dental care system that did not allow the fabrication of a new bridge, it was medically unacceptable to recommend the extraction of teeth that were highly sensitive and painful after having been ground down in preparation for a bridge that no longer stayed in place.

Mr. Patkins disagrees with Defendants as to the problem with the fit between his abutment teeth and the bridge, and disagrees as to the preferable method to deal with that problem. However, even viewing the evidence and inferences therefrom in the light most favorable to Mr. Patkins, no reasonable trier of fact could find that Defendants' chosen course of care was "'medically unacceptable under the circumstances,'" and done "'in conscious disregard of an excessive risk to [Mr. Patkins'] health.'" *Toguchi*, 391 F.3d at 1058. *See, e.g., Powell v. Marlais*, 2016 WL 5462443, *2-4, *13 (N.D. Cal. 2016) (granting summary judgment for prison dentist against prisoner who requested antibiotics, pain medications and a root canal to address dental pain; prisoner had refused the offered care of extraction of two teeth, removal of four-tooth bridge,

15

1 and provision of partial denture from prison dentist who believed there was no bacterial infection
2 and that a root canal would not work); *id.* at *13 ("Plaintiff's allegation that there are other
3 surgeries available that will save tooth 23 does not establish that the extraction of tooth 23 is a
4 medically unacceptable course of treatment") (citation and footnote omitted); *id.* at *14 (fact that
5 other prison dentists agreed to try the root canal treatment that defendant dentist declined to
6 prescribe showed nothing more than a difference of opinion that did not rise to the level of an
7 Eighth Amendment violation); *Sanderson v. Boothe*, 2015 WL 4396213, *2-5 (D. Alaska 2015)
8 (granting summary judgment for prison dentist who denied dentures for prisoner who was missing
9 half his teeth and claimed an inability to eat due to dental pain; dentist had determined dentures
10 were not medically necessary under prison policy because prisoner had poor dental hygiene,
11 normal body weight and problems with his existing teeth were addressed);*Abney v. Cate*, 2013
12 WL 655132, *2-3 (E.D. Cal. 2013) (plaintiff failed to state an Eighth Amendment claim with his
13 allegations that dental staff refused to replace his dental bridge covering six teeth, advised plaintiff
14 that prison dental staff did not perform bridge work, and recommended instead that the metal
15 mounting band be cut off and the bridge replaced with partial dentures; "[t]he fact that Plaintiff
16 wanted the bridge to be replaced is a difference of opinion between himself and prison medical
17 authorities as to proper treatment that does not give rise to a claim"); *Hawkins*, 2006 WL 2587753,
18 at *2, *7 (granting summary judgment for prison dentist where prisoner was given removable
19 denture but wanted instead a dental implant and new bridge to repair teeth damaged by dentist's
20 allegedly improper use of dental super-glue on old bridge).

21     A dentist is not required to be a guarantor of a patient's good health, regardless of whether
22 the patient is in prison or at liberty. What the prison dentist cannot do is be deliberately indifferent
23 to an inmate's serious dental needs. Mr. Patkins fails to present evidence that would allow a
24 reasonable jury to find any defendant was deliberately indifferent to his serious dental needs.
25 When the evidence is viewed in the light most favorable to Mr. Patkins, and inferences therefrom
26 drawn in his favor, no reasonable jury could return a verdict for him and against Drs. Babienco,
27 Tran, Chang, and Kamminga on his Eighth Amendment claims regarding his dental bridge. Drs.
28 Babienco, Tran, Chang, and Kamminga therefore are entitled to judgment as a matter of law on

the Eighth Amendment claim.

## VI. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**. (Docket No. 23.) Defendants are entitled to judgment as a matter of law in their favor on Mr. Patkins' Eighth Amendment claim. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: July 5, 2017

_____
EDWARD M. CHEN
United States District Judge